FRENCH, ADM'R OF HARDEMAN vs. CAMPBELL'S HEIRS.

Facts stated and discussed which the court considers insufficient to charge a party as trustee.

## ERROR to Cooper Circuit Court.

LEONARD & HAYDEN, for plaintiff in error.

1. The final decree and all other orders, decrees and proceedings had, and done in the circuit court anterior thereto, are necessarily presented and proper to be reviewed, considered and determined by this court upon this writ of error. See 17 Johnston's Rep. 550, Jaques vs. Methodist Episcopal Church; 1 Cowen's Rep. 702, Atkinson vs, Marks; 1 John. cases 498, Le Guen vs. Governeur and Kemble; 2 Cow. Rep. 208, Wilson vs. Troup.

2. The defendant, John Hardeman, by his answer, denies every material allegation contained in the bill of complaint, and the complainants have utterly failed to show the answer false in any one particular, by one witness and strong circumstances, as by law it devolved upon them to do to overturn his answer; but, on the contrary, all the testimony in the cause strongly corroborates the truth of his answer.

3. The suit having been instituted by Sophia Campbell (claiming the life estate in the negroes) and her husband for an alleged conversion of the property by John Hardeman, in his life time, to obtain redress for the wrongs of which she complained, cannot now, (she and her husband, and the original defendants all being dead) be converted and transferred as a remedy in favor of the reversioners, the plaintiff, to redress their supposed loss, as is demanded by these new parties, plaintiffs who were strangers to the original suit, and had then no right to mingle or join in the suit, and have no right now to tack themselves upon it. But if they be permitted to come in and tack their suit upon the suit first brought by the tenant for life, it illy becomes them to deny the defendants the right to litigate their rights to the property in the same manner as if the suit had been commenced by them.

4. If there were any evidence in the cause to establish the alleged facts that John Hardeman, in h's life time, was invested as trustee with the legal title to the property and bound to hire out the negroes and to account therefor to Sophia Campbell, and to have the negroes with their increase down to the time of his death to be rendered to another, as his successor in the office, then, we insist that the trust was a personal trust or duty, and so far as the hiring out of the negroes, their management, &c., was concerned, this duty ceased with his existence and did not attach to his

French, adm'r of Hardeman, vs. Campbell's heirs.

estate nor devolve upon his administrator, who is only bound to represent the intestate through his estate in all his liabilities existing at the time of his death; and therefore, in no point of view, upon principle, can the plaintiffs recover in this suit compensation against or out of the estate of the deceased for failing to serve them when dead. This would be a harsh and rigid rule and would be well calculated to increase the horrors of death greatly. We insist that no man's estate can be bound to respond, in the hands of his admistrator, except where he imposes upon it a burthen, directly or indirectly, by contract, or by some act or violation, or neglect of duty, in his life time, for which, by law, a judgment after his death may be obtained.

5. The original complainants, in their bill, show that they had no right in equity, (if it were as they allege, that Jno. Hardeman was the trustee of the property at the time complainants had the possession of it) to charge him after he got possession of it. In account for the value of their services, under the circumstances, as set forth by them, they show that John Hardeman tortuously obtained from them the possession of the negroes and in like manner converted them, by sending them to another State, thereby showing that the possession, (if there were any possession) thus acquired, was held adversely by him as a wrong doer against their right and for which he could only be charged in damages commensurate with the injury sustained by them, to be ascertained and determined by the same rule of law, applicable to all cases of wrong doers, and which is the value of the property with interest upon that value down to the time of assessment. We assert that the complainants affirm, by their bill, that John Hardeman did not obtain and hold the property as their trustee, but on the contrary that he repudiated the trust, held and converted the negroes to his own use. It is true, that if the allegations in their bill be true, charging a transfer of the negroes to him, in trust for the said Sophia, they show a right in her to demand of him, John Hardeman, that he, as trustee, should honestly obtain the possession of the trust property and faithfully and honestly manage and use it as required by the instrument conferring the trust; but we insist that a *cestue que trust* can have no greater right or interest in the trust of property, claimed by him than the absolute owner can have in property which he claims, and by consequence cannot claim or have a greater compensation for the loss of it, or an injury to it. So therefore, if it be true (as we presume it will not be controverted) that the absolute owner of property can only recover for the conversion of his property, its value with interest, and not what he might have realized by the services or the use of it, neither can a *cestue que trust* recover more for a similar injury to his property. But there is nothing shown by the proof that John H. ever had, in fact, the possession of the negroes even as the trustee of Sophia Campbell, nor any thing showing that he was under any obligation to her or her children to serve them in hiring out the slaves, &c; and clearly under no such obligation to these complainants.

6. But if it be true that Sophia Campbell, in her suit, was entitled, as was contended for her by her solicitor, to recover of John Hardeman as upon an account for the proceeds of the hire, or for what might have been realized by him as a faithful trustee by the hiring of the negroes, during his life time, yet that right has been abandoned by her legal representatives since her death, and there is nothing presented in this case making it necessary for this court to adjudicate upon it.

7. We insist that if the complainants ever had a right at any time to charge John Hardeman, as trustee of the property sued for, that right was satisfied, extinguished and abandoned upon a reversion of the contract under which it is alleged to have accrued, by the return of the negro, Lucinda, to John Tharp the agent of Wm. Campbell.

It is expressly shown by the answers of both the Hardemans, and corroborated and proved by John Tharp, the agent of William Campbell, that they delivered to him said John Tharp as agent of said William Campbell, the slave, Lucinda, soon after or about the time of the return to Thomas Hardeman of his four negroes, Manuel, Harriet, and their two children, and that he, Tharp, received her as such agent. Here there are two answers under oath by the two defendants, corroborated by the testimony of the said Tharp, and not one particle of proof, or an attempt at proof by the complainants, to disprove the truth of what those answers affirm; so that, if the allegation in the bill, charging that this woman, Lucinda, was given in exchange for the negro children, Julia Ann, and Washington, had been sustained by any proof, then, we insist, as above stated, that the

return of those negroes to Thos. Hardeman, or to John Hardeman, and the receipt of Lucinda by Campbell dissolved or rescinded the contract under which the exchange is alleged to have been made, and consequently, put an end to all further interest pretended or contended for by complainants in those two negroes, Washington and Julia Ann.

8. We insist that the two answers of the Hardemans clearly deny that there was any other instrument than the will of the said Thomas Hardeman, made in the summer of 1821, by which any transfer of any of the negroes was made to the said John Hardeman, to hold in trust for the said Sophia Campbell. These answers are corroborated by the bill of sale of Lucinda, under the hand and seal of the said William Campbell—by the letter to her father written by Mrs. Campbell herself, in which she expresses her fears or opinion that his last will, in making the gift of the negroes to her, would not effect the object, &c., which he intended by it, &c. The answers are also corroborated by the depositions of John Tharp, Cain and Zadock Martin, even by the impudent and ungrateful letter of Campbell himself, in which he confesses (as he states) that he stated to William L. Smith, a respectable citizen of Clay county, that he, Campbell; had no title to the negroes.

9. We insist that even if it should he held by this court that the plaintiffs have a right to recover in this case, in any view or aspect of it, that then the court below erred in not sustaining the exceptions of the defendant to the report of the commissioner in stating the account under the order of the court. 1st. By the order of the court directing the account to be taken by him, he was directed to take it with reference to the value of the four negroes, Manuel, Harriet, Julia Ann and Washington, and as to the value of their services; whereas he has gone further and taken it with reference to other and additional negroes, not mentioned in the said order of reference. 2nd. That the account, as taken, is not sanctioned by any rule or principle of equity, nor by the proof in the cause.

## ADAMS, MILLER and STUART, for defendants in error.

The complainants conceive that the only question for the consideration of this court, now presented by the record arises upon the action of the court overruling the exceptions of defendant to the commissioner's report and the decree consequent thereon. The question as to the equity contained in the bill and right of the party to relief, as shown by the bill, answer and proofs in the cause, was fully considered by this court at the December term, 1832, when the cause was then first before it in the first judicial district, and which cause the counsel for complainants have not been able to find among the reported cases decided by this court, but from the certified copy of the opinion of the court, it appears that the supreme court held "that the trust is well made out against John Hardeman, and that he has failed to fulfil the duties thereof." The court further says: "The evidence satisfies us, that Thomas Hardeman did confederate with John Hardeman to defeat Campbell and wife from receiving any benefit arising from the trust estate. For these reasons, the decree of the circuit court, dismissing plaintiff's bill, is reversed, and cause remanded," &c. To this opinion of this court, the counsel for complainants would refer the court, and as fully sustaining the opinion, the evidence offered by complainants, particularly the letter of John Hardeman to Wm. Campbell, also the letter of Thomas Hardeman to his daughter.

The counsel for complainants insist that the report conformed to the order of the chancellor, and was warranted by the law and evidence. The first objection is that the commissioner reported the value and annual hire of seven slaves, not named in the order referring the matters of account to him. The complainants conceive that the maxim of law, *partus sequitur ventrim*, fully authorised the commissioner to hear proof as to the fact of issue of the female slaves—that if any issue were found, the law gave them, or their value and hire, to the party entitled to the property in the mother, and in fact the decree required the commissioner to take an account of the hire, profits and value of the slaves, and the issue of course, are a part of the profits.

The second, third, fourth, fifth and sixth exceptions are in substance that the commissioner has charged the defendant with hire, and has charged more hire and assessed a greater value upon the slaves than by law and evidence he was authorised to do, and that the commissioner has charged more interest than he ought to have done. To the first objection, that the commissioner has charged the defendant with the hire of slaves, it is sufficient to say that if this was the object or a part of the trust devolved upon him and accepted by him, then there is no question as to his liability to the *cestui que trust*. It was his duty under the trust to hire the slaves, and account to Mrs. Campbell for the amount of the hire; and if he failed to hire them, then he made himself personally responsible for the hire. It is not deemed necessary to refer to authority to sanction the court in overruling such an objection.

As to the questions whether the commissioner has charged too much for their hire, or affixed too great a value upon the slaves, can only be decided by a reference to the evidence before him, and taken by him under the order of the court. As to the question of interest, there can be no doubt, if the complainants were entitled to the annual hire, during the life of Mrs. Campbell, or her heirs, to the slaves and their profits at her death, as the commissioner has allowed the usual, customary and legal interest, we presume the parties were entitled to that rate if entitled to any.

The 7th and 8th exceptions are in substance that the commissioner has not allowed defendant enough compensation for hiring out the negroes, or for his trouble in rearing the young children. It appears to counsel for complainants, that these objections come with an ill grace from a party, who in his tenth objection says commissioner has allowed complainant's hire when there is no evidence that the slaves were even in his possession, or were ever hired out. The complainants would ask, if the trustee has violated his duty in not keeping the possession of the slaves, after they were delivered to him, can he with any appearance or semblance of justice say that he has not been allowed compensation for rearing and taking care of the young. If it was his duty to hire them out, and he, by failing to discharge that duty, has made himself responsible for their annual value, can he equitably demand compensation "for his trouble in hiring?" Can he be entitled to compensation for doing that which he says was not done? Can he neglect his duty, and then ask for the reward of a faithful servant? But the commissioner did allow him compensation for hiring out the slaves, and this allowance was made from the evidence of experienced men as to the worth of such services. He has allowed the defendant compensation for his trouble and expense in rearing the young slaves; and this predicated upon the same character of evidence. The allowance made for hiring was $534 38, which was more than 5 per cent. upon the whole amount of hire and interest reported by commissioner.

Most of the objections made to the report of the commissioner are such as must be decided by reference to the evidence before him, and that evidence being voluminous, we beg leave to refer the court to it as fully sustaining and warranting the report made, and if that report be sustained, then the decree rendered in the cause was equitable and just.

Judge BIRCH, delivered the opinion of the court.

In the year 1827, during the life-time of John Hardeman, Sophia W. Campbell and her husband instituted against him, in the Howard circuit court, a suit in chancery. The substance of their original and amended bill is, that Mrs. Campbell was the natural daughter of Thomas Hardeman, who was the father of the said John, and subsequently made a co-defendant with him. That some time in the year 1821, the said Thomas came to the residence of the complainants in Boone county,

(in this State,) and after stating to them that he was old, and not longer disposed to give himself trouble with his property or effects, remarked that he owned, amongst other negroes, a family consisting of Manuel, his wife Harriet, and their two children, Julia Ann and Washington. That he had promised Manuel that he would not separate him from his family, and that his desire was to make such an arrangement as to be able to divide the said family, and another man servant named Dick, between Mrs. Campbell and another daughter. He thereupon suggested to the complainants, that as the two children of Manuel and Harriet were worth about as much as a certain negro woman of theirs named Lucinda, if the husband of Mrs. C. would convey to him that woman, he (the said Thomas) would convey the family of slaves in question to Mrs. C. for life, and afterwards to be divided equally between her children by a former marriage and those of her then marriage with Campbell. The bill alleges that this proposition was readily assented to by the complainants, and that in order that the necessary writings should be drawn up, it was proposed by the said Thomas, and acceded to by the complainants, that they should visit their said father, with or near whom, at his then residence in Howard county, the said John Hardeman resided, and who, in deference to his knowlege in the law, it was agreed should prepare the necessary papers. That accordingly, about the month of September, 1821, the complainants did make the visit agreed upon, and that the said John, (at the request of the parties) did prepare a conveyance of the said family of negroes to *himself*, as trustee, to hold for the said Sophia and her children, as previously agreed upon, which was executed by the said Thomas, and left in the possession of the said John. The bill further charges, in this connexion, that the said Campbell by his deed, conveyed to the said Thomas the woman Lucinda—that Manuel and family were delivered to complainants, and that Lucinda was delivered to Thomas, who received her in full satisfaction for said Julia Ann and Washington. (In the view we have taken of this case, it is deemed unnecessary to notice the difference between the original and the amended bill in this and some other respects, our conclusions under the state of the testimony, being the same in either point of view.) The bill goes on to allege, that it was further agreed and understood between the parties, with a view to fulfil the promise alluded to, "not to separate Manuel from his family" during the life of the said Thomas; that if the complainants should take possession of him and family, and they could not agree with each other, they were to be surrendered to the defendant (John Hardeman) as trustee, to be hired out by him for the best price, and the net proceeds, after

deducting necessary expenses, to be paid annually to said Sophia, during her life.

The complainants further state, that afterwards, in the summer of the year 1822, Manuel and his family became dissatisfied and unwilling to live with them—that Manuel ran off from them and went and communicated his dissatisfaction to John Hardeman, who thereupon, in pursuance of the powers conferred upon him as trustee, demanded the restoration of the family, promising in said demand, to comply fully with the requisitions of the agreement by hiring out the negroes, and paying the net proceeds to said Sophia. That the complainants complied with said demand, by delivering the negroes to said John on the 27th day of August, 1822, at which time, in the fulness of their confidence in him, they did not lift the said agreement, and that they never had a copy of it. That they had made frequent applications for a copy of the agreement, and for payment of the hires, &c., all of which had been refused by said John, who denied having any agency or trust to perform for them touching any of the premises in controversy.

They also charged him with having aided and assisted others in running the negroes into unknown places in Tennessee, so as to cheat and defraud them—that the negro woman has had increase since her return by the complainants, and they call for an account of the hirings, for a discovery of the residence of the negroes, for the displacement of said John, and the appointment of another trustee, and for all other reasonable and appropaiate relief.

The answer of John Hardeman denies that he was ever invested, as trustee, with any right, power or authority, to hire out, control or manage said negroes, by virtue of any transfer of them by his father, under any instrument drawn by himself or any one else. He denies ever having had the negroes in his possession, care or government, or that he has ever hired them out, or received any hire for their services, as charged in the bill, or that he ever mismanaged them, as trustee, or otherwise. He admits that in the summer of 1821, he drew a will for his father, in which he was appointed executor, and also trustee for said Sophia, in regard to the contemplated bequest therein of said Manuel and family, (or a part of them,) but insists that as his father was still living, he did not thereby acquire or even then have the power, as trustee, to exercise the duties therein contemplated.

He admits that by a bill of sale, dated on the twelfth of September, 1821, the husband of said Sophia transferred to his father the negro woman Lucinda, for the consideration, as therein stated, of the contemplated bequest in favor of his wife and her children ; and he assigns as one

of the reasons why his father desired thus to settle the property upon his daughter and her children, that it was to guard her ultimate interest in case a separation, which was at one time portended, might take place between them.

He further states, that in the month of November, 1821, the complainants, whilst removing from Boone to Clay county, stopped at the residence of his father, where he (the respondent) also *then* resided, and that *at his suggestion*, his father loaned to the complainants the family of negroes in question, in order to assist them in opening a new farm, but that he took from Campbell a bond to return the negroes whenever he (respondent) should request their return to his father; the reason why they were to be returned at the request of respondent being, that he *might* and *would* become the actual trustee, in case his father did did not change the provision in his will, which he might and intended to do, should the said Manuel and family become dissatisfied and unwilling to live with the complainants. He also states that the obligation given by Campbell for the return of the negroes to his father, is the only one he ever had in his possession in regard to the entire transaction between his father and the complainants, and that upon the return of the negroes to his father, that bond was cancelled and Campbell notified thereof, and that it is since lost or mislaid.

He further states, that at the time said bond was given by Campbell for the contingent return of the negroes, he distinctly remembers to have stated to him, that as the consideration for the transfer of Lucinda, as specified in the bill of sale, was the contemplated bequest of Manuel and family, by said will, to his wife and children, if his father should *change* the will, and not *make* the bequest, a court of equity would decree a restitution of Lucinda to him, said Campbell.

He denies all knowledge of any transfer of Manuel and family, by his father to the complainants, as set forth in their bill, as also all knowledge of the number of children (if any) born of Harriet since her return to his father, nor does he know what disposition his father made of them, or where they are. He admits that Lucinda was left at his father's during the temporary use of Manuel and his family by the complainants, and his answer to the amended bill states that she was returned to the agent of the complainants on the 15th of October, 1823.

He asserts, finally, that he recalled the said Manuel and his family from the possession of the complainants at the request and in conformity to the wishes of his father, who afterwards made some disposition of them, in which he (respondent) had nothing to do, and denies all fraud and confederacy, as charged in the bill.

The substance of Thos. Hardeman's answer concurs with that of John Hardeman. He emphatically denies that he ever transferred, or contracted to exchange with Campbell, the two negro children, Julia Ann and Washington, for the negro woman, Lucinda, as charged in the original bill of complaint. He denies that he ever transferred to John Hardeman the said children, or any of the negroes, to hold in trust for said Sophia and her children, but admits that in the year, 1821, he got his son John to draw his *will*, in which he *willed* to John the said family of negroes, in trust for said Sophia during her life, and after her death to her children, but of which will the said John never had the possession, it having been retained by him (the testator) with a view to make any change in its provisions he might subsequently think proper.

He states that he made known to the said Sophia, previous to this time, that he would make a will of these negroes, in trust for her and her children, upon the condition that her husband would transfer to him said Lucinda, so as to enable him, in the division of his property, to give to another daughter the said Lucinda and a negro man named Dick —but that in the transfer to him of the said Lucinda, the consideration of such transfer should be expressed to be the "provision for the said Sophia and her children in his will," so that if he should ultimately change his mind as to this provision, the said Campbell (her husband) could *retain* his woman Lucinda. He further states that this will, with the said provision as made therein, together with the condition suggest-by him to Sophia, was made known to her said husband, who appeared and consented to it, and afterwards, in the month of September, 1821, by writing, in which "the provision in the will" was expressed as the consideration thereof, transferred to him the said Lucinda.

He states, further, that he had not intended to give the possession of these negroes to Campbell, but that in the month of November, 1821, the complainants and their family came by his home on their way moving from Boone to Clay county, when John Hardeman, in view of their condition, suggested to him (respondent) the propriety of lending them Manuel and his family, in order to assist them in making a new farm in Clay—suggesting at the same time, that it would be the means of ascertaining whether the negroes would be content and satisfied to remain with them, as well as to enable him to judge whether the complainants were worthy of his bounty; and that being thus influenced, he loaned the negroes to the complainants, and took Campbell's bond for their return to him whenever requested by John Hardeman, who being the general agent of his father in the transaction of his home, and for the addi-

French, adm'r of Hardeman, vs. Campbell's heirs.

tional reason that the respondent might *not* change the provision inserted in his will, it was thought proper to insert with power to protect either the interest of the respondent, or those of Mrs. Campbell and her children, against the possible consequences of her husband's misconduct, &c.

In the view we have taken of the case as presented by the record, it is unnecessary to embody more of the answer or the amended answer of this respondent, than that the complainants left with him the woman Lucinda at the time he loaned them Manuel and family; that Manuel and family came home to him by themselves, and that some short time after their return, Lucinda was delivered to John Thorp, who received her as the agent of the complainant, Campbell.

At the December term of the Howard circuit court, in the year 1829, the bill of the complainants being dismissed, they appealed to this court, which reversed the decree of dismissal and remanded the cause. Since then, the suit has been again tried in the Cooper circuit court, upon the original and much additional testimony subsequently furnished by both parties, so'that there is perceived no discourtesy or irregularity in treating the record now before us, as one which has not heretofore received the consideration of this court.

Whilst the testimony as it now stands is somewhat conflicting and contradictory, it is not deemed to be of a nature either wholly irreconcilable, or of a character to overturn the explicit denials of the defendant's answer—the rule being that that can only be done by two witnesses, or one witness, and strong corroborating circumstances, implying, of course, in cases like the present, (where there are facts and circumstances on both sides) the *preponderance* of strong corroborating circumstances.

For the complainants, some of the witnesses testify to conversations they had with Thomas Hardeman, subsequent to the period when he made the disposition which has been stated of Manuel and his family, in which conversation he is represented as having *given* the negroes to his daughter, or to her husband Campbell. Grant this to be true, and yet, when considered in connexion with his answer, and with the other testimony in the case, it could mean nothing more than that that was the disposition he had made of them in his will, which will, however, he had the power either to change, annul or destroy at any subsequent period of his life, and which it is but fair to presume he did destroy, since it seems from his answer, made during his lifetime, that for reasons satisfactory to himself, he had given the property in question to other persons, in Tennessee. At all events, as there is nothing in the

record even tending to establish such a will, and as it appears from the testimony that the woman, Lucinda, in consideration of the transfer of whom the provision *was to be* made in the will, was delivered up to the agent of the complainants after the return of Manuel and family, it cannot be reasonably or equitably contended, that the estate of Thomas Hardeman should be held liable under its alleged provisions, and even less that the estate of *John* Hardeman can be held liable, either for the mal-performance or non-performance of an alleged trust, which it is clear never had any legal existence.

This brings us to the letter which was written by John Hardeman to the complainant Campbell, and which, as it constitutes the only or main reliance for charging him as a fiduciary or trustee, it may be proper to copy entire. It is dated on the 6th of August, 1822, and is as follows:

Dr Brother—Mr. Burnett is now down at Glenn Owens' and says he has a letter for father, but has not yet delivered it; and as Manuel is also here, I write immediately to you, and send him back with the letter.

From the present situation of your affairs, it is certain you cannot derive any benefit from the negroes, and at the same time carry into effect my father's design in giving their use to my sister Sophia. His object was to have them kept together, and well treated, old and young. There now seems to be such a difference between you and them that they will not render you any service. It is therefore necessary for me to discharge my duty, and carry the trust into effect, by taking the negroes and hiring them out, and whatever sum of money their hire will produce, after having them well fed and clothed, and all expenses deducted, shall be paid to Sophia, as it shall from time to time be received by me. They will be put in a place where they can be together, and be well fed and well clothed in the first place, as this was the design and intention of my father in the origin of the trust. He wrote to Sophia some time ago, in answer to a letter from her by Mr. Thorp, which letter Manuel says has not been received by you. Since that time he has altered his opinion as it respects the separation of the children from their parents, and has determined to have nothing more to do with the business, unless you shall think it more profitable to return them, and take Dick and Lucinda, with the power of selling or using them as you may think proper, but this cannot be done unless you agree to it immediately, for in the fall they will be given away to another person who will be here at that time. You will counsel with Sophia and determine what is best, either to take Dick and Luce, and make them wait on you, or to have the others taken from you and put

French, adm'r of Hardeman, vs Campbell's heirs.

where they can be contented, and the net profits paid to her after they may be received, after deducting their food and clothing and other expenses. Please let me know immediately, and whether you agree to the change or not, bring or send them down as the expense will be more for me to come up after them. Should you agree to take Dick and Luce, with a bill of sale, you can take them back with you, should you come yourself, or should you send Manuel and his family by some other person, they can take up Dick and his wife to you. My father has told me to write to you, as he does not wish to be troubled any more about this or any other business, and I must carry *his wishes* into execution as far as I have the power. My opinion is that you would both be benefitted by the exchange, during your lives at least, as your personal labor would not then be so necessary as if the others were taken away and the hire paid to my sister once a year.

I hope you are both well and I am respectfully yours

Mr. Wm. Campbell.         JOHN HARDEMAN.

It will be seen that this letter was written at the instance or bidding of Thomas Hardeman, the owner of the slaves and the father of the respondent. From what motive he was influenced in directing the recall of the negroes he had loaned to the husband of his daughter, demonstrated as it seems to be, by the letter which he thus caused to be written by his son, (the respondent,) that up to that period at least he continued to cherish the purpose, (as it is apparent he retained the will,) to make these negroes, or others, in some manner available to his daughter, may perhaps be gathered from a letter of precedent date, addressed to him by Mrs. Campbell, but proved to be in the handwriting of a friend, who testifies that he wrote it at her request, and that it contained the substance of *repeated* conversations between Mrs. Campbell and himself in the presence of her husband. It is dated in Clay county, on the 31st of June, 1822, and runs as follows:

*Dear and Reverend Father*: With the almost insensible feelings of friendship and gratitude towards a benevolent parent, who in his wisdom has thought it proper (after seriously contemplating the subject,) to bestow upon me such a portion of wealth as it has pleased you to do, I feel myself humbly reconciled that your will is my pleasure, and that the situation in which the property stands, I fear will not prove to answer the ends which was intended by you when you made your last will, &c. The reason that I think it may be doubted, is, I very much fear that I shall not by any means be able to keep the negroes that it has been your pleasure to give me, as they both fight Mr. Campbell and me to the very last struggle. Manuel has bit Mr. Campbell's thumb,

French, adm'r of Hardeman vs. Campbell's heirs.

and Harriet has bit my thumb, and they say and bitterly swear that they never will stay with me. They both have threatened to take lives, and Manuel has made the attempt, and has once carried his butcher knife with the intent of murder, as he himself said. And as you, father, is getting old, and life is uncertain, the probability is that they may have to be sold, and if so, I wish them to be sold in your time, &c., and then you can, with your pleasure, and also your *will*, give to me in money, or in other negroes, such a portion as you think proper to do, and then I shall be satisfied; and if you should die, and the negroes be sold, and any jar should take place, I should not be satisfied, even if I should get twice as much as you yourself give me. * I shall conclude and refer until I shall receive an answer to this. Your unworthy but affectionate child.

SOPHIA W. CAMPBELL.

THOS. HARDEMAN.

It is thus demonstrated, that up to the period of the re-delivery of the negroes in question, neither Campbell nor his wife even *pretended* that there was any other arrangement than the one in the will, or that that was either final or binding. Such is substantially the admission of their own letter, and such also the substance of their cotemporaneous, continuous and concurrent conversations, as testified to by several of their most respectable neighbors and acquaintances in Clay county. It needs therefore, but a little attention to dates, and a little reflection upon the nature of the transaction we are reviewing, to perceive how natural it was for John Hardeman to speak of himself as a trustee in respect to the property in suit, without being in fact such, except contingently, under the will of his father, the substance of which the old man still then continued to cherish the purpose to stand by, but ultimately changed that purpose, as he had the sole and unquestionable *right* to do, as is admitted upon *every* hand. To assume upon such a state of facts as this, to hold a man responsible as trustee, in respect to property which another could reclaim absolutely and at his pleasure, and which he did reclaim *at the instance of the complainants themselves*, would be to affirm the proceedings and decree we are viewing, rendered (we will not doubt) upon the deferential yet mistaken assumption, that as the former decision of this court found the property to have been in the complainants, and the defendant, John, to have been a trustee for their benefit, and that of the heirs of Mrs. Campbell, the testimony subsequently introduced did not sufficiently vary the record of the facts to justify the subsequent chancellor in disregarding the original finding of our predecessors.

There is much more in the record which might be referred to in concurrence with the conclusion we have arrived at, the letters of Campbell himself, written from Clay county to Thomas Hardeman, on the 25th of May, 1823, in which he *expressly* disclaimed that he ever had any legal right to the negroes, being but corroborative of the testimony of a number of gentlemen in that county, who testify freely and fully concerning his conversations, and from which it would seem that his *only* reliance was upon such provision as the father of his wife might *ultimately* make in his will. It may as well, perhaps, be added here, that we perceive nothing in the mutilated letter of the old man, *incompatible* with this, and therefore nothing which should deprive him of its ultimate benefit.

The whole array of family testimony is sufficiently reconcilable, and the whole case stands thus: Whatever is proven to have been said or written by Thomas Hardeman, as to having *given* the negroes in question to the complainants, was spoken or written pending his purpose to adhere to the provisions or the substance of the undelivered will of 1821 ; and whatever was written by John Hardeman, at the instance of his father, was dictated and written under the same circumstances. Neither of the complainants were ever imposed upon, or *in any sense* misimpressed, by what was thus said or written, for both of them, from first to last, are proven to have recognized the authority of the testator to modify or revoke his intended bequest, as he did, and to give to them, or withhold from them, according to the discretion which it seems he subsequently exercised. This being the case, and the negro woman, Lucinda, having been restored to them, (as already stated) there remains of the entire transaction nothing whatever to invoke either the interposition of a court of equity or a court of law.

The decree of the circuit court is accordingly reversed and the bill dismissed—the costs of the first trial in both courts to be paid by the defendants, and all subsequent costs by the complainants.

Judge Ryland, having been of counsel, not sitting.